209 P.3d 497 (2009)
In re the WELFARE OF T.B. and D.B., Minor Children.
Nos. 37006-9-II, 37013-1-II.
Court of Appeals of Washington, Division 2.
April 7, 2009.
Publication Ordered June 16, 2009.
*498 Peter B. Tiller, The Tiller Law Firm, Centralia, WA, for Appellant.
Stephen H. Hassett, Office of the Attorney General, Olympia, WA, for Respondent.
BRIDGEWATER, P.J.
¶ 1 K.B., mother of minors T.B. and D.B., appeals the Pacific County Superior Court's order terminating her parental rights. We affirm the terminations.

FACTS
¶ 2 K.B. is the mother of T.B. and D.B. In 2005, the Department of Social and Health Services (DSHS) received several referrals indicating that K.B. and the children's father[1] mistreated the children. The reports *499 alleged that K.B. allowed known felons with a history of drug use and violence to live in her house, the house was filthy, K.B. did not have any food in the house, K.B. began using drugs again, and both parents were drinking and driving with the children in the car.
¶ 3 On December 29, 2005, DSHS filed dependency petitions on both children and officers attempted to pick the children up. K.B. withdrew the children from school and was on the run with the children until March 2006, when officers arrested the man she was traveling with and took the children into protective custody. DSHS placed D.B. in relative care with Marlys Tune, K.B.'s mother, and placed T.B. in relative care with Leslie Aho in Florida.
¶ 4 K.B. signed an order agreeing to declare the children dependent under RCW 13.34.030(5)(b) and (c).[2] DSHS provided individual service and safety plans for each child, providing:
It is the parents['] responsibility to correct these defencies [sic] to the court's satisfaction, and not just to comply with a list of services.

For the mother [K.B.]:
1) Complete a domestic violence assessment from a state approved provider, and follow the recommendations of the assessment.
2) Complete a drug and alcohol assessment from a state approved provider. Follow all recommendations of the assessment.
3) Complete a mental health assessment from a state approved provider. Follow all recommendations of the assessment.
4) Successfully complete a state approved parenting class.
5) Maintain a clean, sober, and law abiding lifestyle. Do not associate with individuals that are not clean, sober, or law abiding.
6) Clear up all legal matters including the two warrants for her arrest.
7) Comply with random drug screen testing at the request of the caseworker, and all service providers.
8) Maintain an appropriate, stable and safe residence that is free from hazards and weapons.
9) Maintain weekly contact with the caseworker. Keep the caseworker informed of address and/or phone number changes. Sign a release of information between the caseworker and all service providers.
10) Fully cooperate with the case plan for her children.
11) Maintain a consistent visitation schedule with her children.
Ex. 2, at 8.
¶ 5 Josh Jewell, the initial DSHS social worker on the case, testified that on six different occasions during the six months following the dependency determination, he provided K.B. with specific information regarding the services K.B. needed to use in order to get her children back. He provided this information both orally and in writing. Jewell referred K.B. to four separate parenting classes, but she failed to attend any of them. He also referred her for a drug and alcohol assessment and for urinalysis screening, but K.B. failed to follow through with the referral, missing multiple scheduled urinalysis appointments by either failing to appear or by claiming she was busy. K.B. failed to participate in a domestic violence support group and failed to submit to a mental health assessment. Jewell testified that the only time K.B. satisfied any of the recommended services was when she provided DSHS with a copy of a domestic violence assessment that she had completed during an earlier dependency.[3]
*500 ¶ 6 Chris Wilkin, K.B.'s DSHS caseworker at the time of the termination, testified that he had only sporadic contact with K.B. but that he met with her on at least two occasions to discuss services. K.B. told Wilkin on those occasions that she was participating in services, but she did not provide Wilkin with any information from the service providers or other proof of her participation.
¶ 7 Approximately 14 months after DSHS filed dependency petitions for the children, K.B. obtained mental health, drug, and alcohol assessments. The mental health assessment recommended that K.B. participate in both individual and group treatment, but K.B. did not participate in either. K.B. began a parenting class, but the instructor dropped her from the roster after a few sessions because she stopped attending.
¶ 8 K.B. began a substance abuse treatment group called "Seeking Safety" in Cathlamet, Washington. VRP at 63, 64, 66. The "Seeking Safety" program admitted K.B. in May 2007 following her drug and alcohol assessment but subsequently discharged her as a no-show. She applied for re-entry in late September 2007. By the time of her termination trial, she had attended sessions for less than six weeks. The program counselor testified that K.B. would need to continue in individual and group sessions for another year.
¶ 9 The service and safety plan also required that K.B. maintain consistent visits with her children. K.B. properly maintained consistent visits at first, but she eventually started failing to appear at the DSHS office for the visits. The missed visits had an emotional impact on D.B., so the caseworker began requiring K.B. to be physically present before D.B.'s caretaker would bring him to the office. In late 2006, DSHS suspended K.B.'s visitation due to what K.B. called "transportation problems." VRP at 11. The record also supports that K.B. would call at the last minute to cancel the visitations. K.B. last visited D.B. in December 2006 and she testified that she had not seen T.B. in over a year.
¶ 10 DSHS filed termination petitions on May 15, 2007. The termination hearing began on October 31, 2007. The children's guardian ad litem (GAL), Scott Jacot, examined each witness during the hearing. Following final arguments, K.B. objected to the GAL making a recommendation in the case "without first laying a foundation that he has in fact done an independent investigation." VRP at 138. The State responded that K.B. should have objected at the beginning of the hearing if foundation was an issue, because foundation would remain an issue throughout the hearing, not just at the end. The trial court reviewed the former RCW 13.34.105(1) (2000) requirements and allowed the parties to re-open testimony so that the State and K.B. could examine the GAL on the nature and extent of his investigation in this case. When K.B. asked the GAL what current information he based his opinions and recommendations on, he replied:
I have recently met with [K.B.], talked to her a little bit about services. Other than that, Iyou know, Mr. Wilkin has interviewed the children recently and I did not interview to ask the exact same questions Mr. Wilkin did. I didn't feel like that would be in the best interest to ask [D.B.] the exact same questions that Mr. Wilkin had already asked about where would he like to be placed. So in that aspect, I am relying on Mr. Wilkin's testimony about what [D.B.] said.
VRP at 146.
¶ 11 The trial court examined the GAL:
Q. So is it fair to say that you might receive a written report fromas an example in this case from Mr. Wilkin, but do you follow up on those reports and call Mr. Wilkin and discuss whatever it is he's written?
A. Yes, I do.
VRP at 146. The GAL testified that he would have followed up on Wilkin's report if he disagreed with it. The trial court expressed its surprise that the GAL had not communicated with the children in a year, but the GAL explained that when the children *501 seemed stable in their placements, he did not interfere.
¶ 12 Following examination, the trial court overruled K.B.'s objection and allowed the GAL to make recommendations regarding the children's best interests. The trial court indicated that it would decide, "what weight to give to [the GAL's] recommendations or recommendation and to anything else [the GAL says] at closing." VRP at 149.
¶ 13 The trial court terminated K.B.'s parental rights for both children. The trial court found that DSHS proved the elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence. The trial court indicated that K.B. seemed sincere in her desire to turn her life around, but the trial court did not believe her testimony about transportation problems as the cause of her failure to use services. Finally, the trial court found that K.B.'s six weeks in drug treatment and mental health counseling was "not a sufficient basis at the 11th hour, or actually the 11.75 hour, to find that there's a reasonable basis that things will continue to improve such that ... in two months the children will be returned to you." VRP at 164.
¶ 14 K.B. appealed the trial court's termination. Our commissioner affirmed the termination and K.B. moved us to modify the commissioner's decision. We granted K.B.'s request.

ANALYSIS
¶ 15 The statutory framework for terminations imposes on the State the burden to prove all of the six elements of RCW 13.34.180. If the State satisfies this burden, it must then establish that the termination is in the children's best interests. RCW 13.34.190(2). The GAL report primarily concerns this second burden; the children's best interests. Former RCW 13.34.105(1). Thus, we first address challenges to RCW 13.34.180 and then address K.B.'s challenges regarding RCW 13.34.190 and former RCW 13.34.105(1).

I. Conditions Remedied In Near Future
¶ 16 K.B. claims that the State failed to establish that there was little likelihood that the conditions would be remedied so that the children could return to K.B. Specifically, she challenges two of the trial court's findings of fact, 2.4(e) and 2.91.[4] These findings provide:
2.4(e) There is little likelihood that conditions will be remedied so the child can be returned to the parent in the near future.
....
2.91 The court fully incorporates herein all its verbal findings of fact stated on the record.
CP (D.B.) at 8, 9.[5]
¶ 17 We review findings of fact for substantial evidence. In re Dependency of K.S. C., 137 Wash.2d 918, 925, 976 P.2d 113 (1999). Substantial evidence is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise. World Wide Video, Inc. v. City of Tukwila, 117 Wash.2d 382, 387, 816 P.2d 18 (1991), cert. denied, 503 U.S. 986, 112 S.Ct. 1672, 118 L.Ed.2d 391 (1992). We do not review credibility determinations on appeal. In re Dependency of A.V.D., 62 Wash.App. 562, 568, 815 P.2d 277 (1991).
¶ 18 Before a trial court may terminate parental rights, the State must prove RCW 13.34.180(1)'s six statutory allegations by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a); K.S.C., 137 Wash.2d at 925, 976 P.2d 113. K.B. challenges that the State failed to prove RCW 13.34.180(1)(e). RCW 13.34.180(1)(e) provides:
That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that *502 conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided. In determining whether the conditions will be remedied the court may consider, but is not limited to, the following factors:
(i) Use of intoxicating or controlled substances so as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documented multiple failed treatment attempts; or
(ii) Psychological incapacity or mental deficiency of the parent that is so severe and chronic as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documentation that there is no treatment that can render the parent capable of providing proper care for the child in the near future.
¶ 19 If the State offers or provides all necessary services reasonably capable of correcting parental deficiencies within the foreseeable future, and the parent does not substantially improve within a year of the dependency order, a presumption arises that the State has established RCW 13.34.180(1)(e). If RCW 13.34.180(1)(e)'s rebuttable presumption applies, it shifts the burden of production, but the State must still convince the trial court that it is highly probable that the parent would not improve in the near future. In re Welfare of C.B., 134 Wash.App. 942, 956, 143 P.3d 846 (2006). A parent's unwillingness to avail herself of remedial services within a reasonable period is highly relevant to a trial court's determination as to whether the State has satisfied RCW 13.34.180(1)(e). In re Dependency of T.R., 108 Wash.App. 149, 165, 29 P.3d 1275 (2001). Although K.B. does not address it, this presumption clearly applies in her case.
¶ 20 The parties agreed to establish the children as dependent in regards to K.B. on May 9, 2006. The individual service and safety plans described above indicate that it was K.B.'s responsibility to correct her deficiencies and that K.B. knew of the services,[6] but the record indicates that she failed to engage in any services for over a year from the dependency determination, other than to provide her caseworker with a copy of a domestic violence assessment she completed during the previous dependency. When the State filed termination petitions on May 15, 2007, K.B. had still failed to engage in services, maintain contact with her caseworker, or visit with her children on a consistent basis.
¶ 21 After the State initiated termination petitions, K.B. obtained mental health and alcohol assessments. This occurred approximately 14 months after the State removed D.B. and T.B. from her care. Even then, she failed to follow through on the recommended group and individual treatment. A parenting class that she attended for a few sessions dropped her from the roster as a no-show.
¶ 22 The record supports that at the time of the termination hearing, K.B. had participated in an outpatient substance abuse program for six weeks. Her counselor testified that she would likely need to continue in group and individual sessions "for another year." VRP at 65. The presumption applied in this case.
¶ 23 K.B.'s primary argument is that C.B. is dispositive in her case because she was making some degree of progress and because 6 to 12 months should constitute "near future." Br. of Appellant at 18. What constitutes *503 "near future" depends on the child's age and the placement circumstances. C.B., 134 Wash.App. at 954, 143 P.3d 846. While this is true, we can easily distinguish C.B. from K.B.'s case on other grounds.
¶ 24 In C.B., the State contended that the past behavior of the mother established the rebuttable presumption. C.B., 134 Wash. App. at 955, 143 P.3d 846. The mother contended that she rebutted that presumption because she made substantial progress. C.B., 134 Wash.App. at 956, 143 P.3d 846. We determined that the presumption applied, but we held that "because it implicates a parent's constitutional rights, this presumption shifts only the burden of production to the parent." C.B., 134 Wash.App. at 955, 143 P.3d 846. Accordingly, we held that "even though the presumption applies, the State retains the burden of convincing the court that it is highly probable that [the mother] would not have improved in the near future." C.B., 134 Wash.App. at 956, 143 P.3d 846.
¶ 25 The C.B. court noted that the mother's primary deficiency related to drug use. C.B., 134 Wash.App. at 956, 143 P.3d 846. We held that the mother met her burden to produce evidence that she was improving in that area because she completed her chemical dependency programs and presented evidence from her counselors and friends that her prognosis was good and that she was a different person. C.B., 134 Wash.App. at 956. 143 P.3d 846. Even the State conceded that the mother was on the right track, doing what she was supposed to be doing. C.B., 134 Wash.App. at 956, 143 P.3d 846. Her only outstanding service was for anger management, which she was enrolled to begin shortly after the termination hearing. C.B., 134 Wash.App. at 957, 143 P.3d 846.
¶ 26 We then evaluated whether the evidence produced at the hearing was sufficient to convince a rational trier of fact that it was highly probable that the mother would not improve her conditions within six months to a year, beyond which testimony indicated the children would suffer outside a permanent setting. C.B., 134 Wash.App. at 956, 143 P.3d 846. Holding that substantial evidence did not support that court's finding that it was unlikely that conditions would be corrected so that the mother could reunite with her children in the near future, we reversed the termination order. C.B., 134 Wash.App. at 959, 143 P.3d 846.
¶ 27 K.B. argues that, just like in C.B., she was making progress in her services and was actively involved in chemical dependency treatment. The State counters that we should not construe RCW 13.34.180(1)(e)'s rebuttable presumption as a guarantee that any late participation by a parent in remedial services will stop a termination proceeding. The State is correct. The trial court stated:
I find that six weeks in a drug treatment program and mental health counseling is not a sufficient basis at the 11th hour, or actually the 11.75 hour, to find that there's a reasonable basis that things will continue to improve such thatMr. Turner's argument that in two months the children will be returned to you ... But I don't find that there's even any chance whatsoever, based upon your history and upon your testimony and the testimony I heard, that your children would be returned to you, even on a limited basis, within at least six months to a year. And the kids have waited long enough ... it's in their best interest, I'm convinced, to have both your parental rights terminated.
VRP at 164. K.B.'s circumstances are far different from the mother in C.B., who had completed her drug treatment, other services, and had several witnesses testify on her behalf as to her improvement. We hold that substantial evidence supports the trial court's finding that there was little likelihood that conditions would be remedied so the children could be returned to K.B. in the near future. RCW 13.34.180(1)(e).

II. Continuation of the Parent/Child Relationship
¶ 28 As an initial matter, K.B. assigns error to findings of fact regarding RCW 13.34.180(1)(d) and RCW 13.34.180(1)(f). RCW 13.34.180(1)(d) provides:
That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies *504 within the foreseeable future have been expressly and understandably offered or provided.
RCW 13.34.180(1)(d). Although K.B. assigns error to the trial court's finding that the State satisfied this allegation by clear, cogent, and convincing evidence, she does not argue this claim anywhere in her brief. As such, this finding is a verity on appeal. In re Estate of Jones, 152 Wash.2d 1, 8, 93 P.3d 147 (2004).
¶ 29 K.B. next provides a one-paragraph argument that appears to address RCW 13.34.180(1)(f). RCW 13.34.180(1)(f) provides:
That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.
K.B. fails to provide argument supporting the claim. Rather than analyzing this requirement, she states, "[b]ecause RCW 13.34.180(1)(d) and RCW 13.34.180(1)(e) were not proven by clear, cogent, and convincing evidence, the trial court should not have considered RCW 13.34.180(1)(f)." Br. of Appellant at 21. We address this issue briefly.
¶ 30 Clearly, D.B. and T.B. had been dependent for almost 20 months at the time of the termination hearing. K.B. had not maintained consistent visits with the children and had actually ceased visits some 10 months before the termination hearing. K.B. refused to participate in remedial services on a timely basis. The evidence showed that the children were bonded in the placements. VRP at 76. Thus, it is clear that further continuation of the parent-child relationship would diminish the children's prospects for integration into a stable and permanent home. Substantial evidence supported this finding.
¶ 31 The remainder of K.B.'s claim relies on us finding that the trial court erred by determining that the State proved by clear, cogent, and convincing evidence that there is little likelihood that the conditions would be remedied so the children could be returned to K.B. in the near future. We have already addressed this issue when we discussed the trial court's finding of fact 2.4(e) above. K.B. admitted in oral argument before us that she makes this argument based solely on RCW 13.34.180(1)(e), which we addressed above. Accordingly, her argument fails.

III. Best Interests
¶ 32 K.B. claims that the trial court erred by finding that the State proved by a preponderance of evidence that termination of K.B.'s parental rights was in the children's best interest as RCW 13.34.190 requires. RCW 13.34.190 provides that the trial court may terminate parental rights if the State proves the RCW 13.34.180(1) allegations by clear, cogent, and convincing evidence and the trial court finds the termination is in the children's best interest. RCW 13.34.190. K.B. does not develop new arguments here, instead relying on the claim that the State failed to satisfy the RCW 13.34.180(1) allegations discussed above. Accordingly, she claims the trial court could not properly reach the issue of the children's best interests. As the State proved the RCW 13.34.180(1) allegations, this argument fails.

IV. GAL Recommendation
¶ 33 K.B. claims that the trial court erred by considering the GAL's recommendation. Former RCW 13.34.105 provides:
(1) Unless otherwise directed by the court, the duties of the guardian ad litem include but are not limited to the following:
(a) To investigate, collect relevant information about the child's situation, and report to the court factual information regarding the best interests of the child;
(b) To monitor all court orders for compliance and to bring to the court's attention any change in circumstances that may require a modification of the court's order;
(c) To report to the court information on the legal status of a child's membership in any Indian tribe or band;
(d) Court-appointed special advocates and guardians ad litem may make recommendations based upon an independent investigation regarding the best interests of the child, which the court may consider and weigh in conjunction with the recommendations of all of the parties; and

*505 (e) To represent and be an advocate for the best interests of the child.
Former RCW 13.34.105 (2000) (emphasis added).[7]
¶ 34 In addition, our Supreme Court has adopted rules applicable to this type of proceeding:
(g) Become informed about case. A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. A guardian ad litem shall examine material information and sources of information, taking into account the positions of the parties.
GALR 2(g).
¶ 35 K.B. argues that the GAL did not do enough in this case to satisfy his former RCW 13.34.105 obligations and, accordingly, the trial court erred by allowing the GAL to make a recommendation about the children's best interests. K.B. objected to the trial court's consideration of the GAL's recommendation based on a lack of foundation that the GAL had conducted an independent investigation. The trial court allowed the parties to re-open testimony so that the State and K.B. could examine the GAL on the nature and extent of his investigation.
¶ 36 K.B. acknowledges that Washington courts have not defined the requirements of an RCW 13.34.105(1)(e) investigation, but she argues that the investigation should, "at the very least, include an in-depth interview with the parent, interview with the children if age-appropriate, observation of visitations with the parent if possible, and an inspection of the parent's home." Br. of Appellant at 16. K.B. does not cite any authority in support of this contention.
¶ 37 We note that the GAL met with the mother, met with the children and had contact with their relative placements, and met with and reviewed the records of the DSHS caseworkers. The children remained in out-of-home care starting in March 2006. T.B. was placed in Florida. We note that K.B. has no objection to the placement of T.B. in Florida. The Interstate Compact on the Placement of Children home study conducted on the Florida placement is not a part of the record, but the status updates in the record refer to this study taking place and being approved before T.B. moved to Florida. The record also reveals that the Aho house in Florida was an approved foster care house. DSHS social worker Chris Wilkins testified that he received reports from "the courtesy worker there [in FL] and the ChildNet program," with each indicating that the placement was "going very well." VRP at 87.
¶ 38 Here, the GAL testified that he spoke with D.B. twice but that the conversations occurred over a year earlier. He testified that he spoke with T.B. once, also over a year ago, but that the conversation lacked substance due to T.B.'s young age at the time. The GAL spoke with Marlys Tune between five and ten times, the most recent of which occurred two to three months before the termination hearing. The GAL testified that he spoke with Leslie Aho once during a permanency-planning meeting. He met recently with K.B., where he "talked to her a little bit about services." VRP at 146. Beyond his own interactions, the GAL testified that he would base his recommendation to the court on Wilkin's testimony because Wilkin recently interviewed the children. The trial court asked the GAL whether he followed up on Wilkin's reports or discussed the case with Wilkin as opposed to merely taking Wilkin's reports at face value, to which the GAL replied, "I do." VRP at 146.
¶ 39 The trial court indicated that under RCW 13.34.105, it would take into account the extent of the GAL's investigation in deciding what weight to give the GAL's recommendation. We hold that the trial court appropriately considered the GAL's recommendation. Even if we determined that the trial court erred, such error would be harmless because there is no reason to believe that the trial court's decision would *506 have differed without the GAL's recommendation. In re Dependency of O.J., 87 Wash.App. 1108, 88 Wash.App. 690, 696, 947 P.2d 252 (1997), review denied, 135 Wash.2d 1002, 959 P.2d 126 (1998) (Extensive testimony during termination hearing from teachers, therapists, relatives, and caseworkers was strong enough to convince Division One that, if appointed, a GAL would have reached the same conclusion as the trial court).
¶ 40 Certain cases establish the standard that a GAL must satisfy to justify a finding. This is a case that sets the minimal standards for a GAL investigation under the version of former RCW 13.34.105 in effect at the time of this termination hearing. As we have noted, it would not be adequate under the new requirements, but we have examined the record and are satisfied that an investigation took place. We agree with the State that it was "not the most thorough investigation possible." Br. of Resp't at 26. We hold that the court did not err in considering the GAL's recommendation and giving it the appropriate weight considering the lack of current personal contact with the children.
¶ 41 Affirmed.
I concur: QUINN-BRINTNALL, J.
ARMSTRONG, J. (Dissenting).
¶ 42 The majority concludes that the GAL's investigation here "sets the minimal standards for a GAL investigation under the version of former RCW 13.34.105 in effect at the time of this termination hearing." Majority at 505. I disagree.
¶ 43 Termination proceedings involve the difficult task of balancing the fundamental liberty interest that parents have in the care and custody of their children and the State's obligation to protect the health and safety of the children. In re Welfare of C.B., 134 Wash.App. 942, 951, 143 P.3d 846 (2006). As such, termination proceedings are not to be taken lightly. In re Welfare of Bennett, 24 Wash.App. 398, 401, 600 P.2d 1308 (1979).
¶ 44 The GAL's investigation and report are intended to ensure that the trial court's termination decision is in the "best interests of the child." RCW 13.34.190(2). The State must present "clear, cogent and convincing evidence" in order to permanently deprive a parent custody of his or her children. In re Dependency of K.R., 128 Wash.2d 129, 141, 904 P.2d 1132 (1995) (citing RCW 13.34.190). "When adjudicating the `best interests of the child,' we must in fact remain centrally focused on those whose interests with which we are concerned, recognizing that not only are they often the most vulnerable, but also powerless and voiceless." In re Parentage of L.B., 155 Wash.2d 679, 712 n. 29, 122 P.3d 161 (2005). Thus, in a termination proceeding, the GAL must "represent and be an advocate for the best interests of the child." Former RCW 13.34.105(1)(e) (2000). In this role, the GAL should investigate and collect relevant information about the child's situation, bring forward any changes in circumstances, and also "make recommendations based upon an independent investigation regarding the best interests of the child." Former RCW 13.34.105(1)(d) (emphasis added).
¶ 45 Here, the GAL had little direct contact with the children or their caretakers. He talked with T.B. once, a year before the hearing, but the discussion had "no real substance" because of T.B.'s age. VRP at 145. The GAL also talked once with Leslie Aho who was caring for T.B. in Florida. The GAL did not talk with any other adult who had continuous contact with T.B. in Florida. The GAL talked with D.B. twice, also more than a year before the hearing. And although the GAL talked with D.B.'s caretaker five to ten times before the hearing, he did not talk with any other adult who had continuous contact with D.B. Moreover, because the GAL filed no reports of his investigation, the trial court had little information as to the substance of the GAL's talks with the two adult caretakers.
¶ 46 The GAL did not base his recommendation on an independent investigation; rather, he based it on the findings of the DSHS worker who began the proceedings. In doing so, the GAL violated GALR 2(b), which states, "A guardian ad litem shall maintain independence, objectivity and the appearance of fairness in dealings with parties and professionals, both in and out of the courtroom." See also In re Dependency of J.B.S., 122 Wash.2d 131, 139, 856 P.2d 694 (1993) ("In a *507 dependency proceeding, it is the duty of the guardian ad litem to represent the best interests of the child and advise the court fairly") (citing N. Am. Council On Adoptable Children v. Dep't of Soc. & Health Servs., 108 Wash.2d 433, 438, 739 P.2d 677 (1987); In re Harney, 19 Wash.App. 85, 87, 574 P.2d 395 (1978)).
¶ 47 Moreover, a GAL should "become informed about the facts of the case" and "contact all the parties." GALR 2(g); see former RCW 13.34.105(1). Implicit in the rules establishing a GAL's duties is the concept that the investigation must not only be thorough, but also up-to-date. Here, the GAL failed both standards. The GAL spoke with D.B. only twice, more than a year before the hearing and to T.B. only once, also more than a year before the hearing. Further, he last spoke with D.B.'s guardian two or three months before the hearing and he had only one conversation with T.B.'s guardian, five to nine months earlier.
¶ 48 The majority relies on In re Dependency of O.J., 87 Wash.App. 1108, 88 Wash. App. 690, 696, 947 P.2d 252 (1997), in concluding that although the GAL's investigation was "not the most thorough," any error was harmless because "there is no reason to believe that the trial court's decision would have differed without the GAL's recommendation." Majority at 506. The problem with this analysis is that we have no way of knowing what a thorough, up-to-date, independent investigation would have shown. In In re Dependency of O.J., 88 Wash.App. at 693, 947 P.2d 252, the court failed to appoint a GAL. Nonetheless, the court held the error harmless because the trial court heard testimony from the minors' teachers, therapists, caseworkers, and a foster mother. In re Dependency of O.J., 88 Wash.App. at 696, 947 P.2d 252. The court concluded that the testimony from these witnesses was "so strong that we are confident that a guardian ad litem would have reached the same conclusion as the therapists and the court." In re Dependency of O.J., 88 Wash.App. at 696, 947 P.2d 252. We cannot reach the same conclusion because the trial court heard nothing from the adults who were active in the minors' daily lives. In re Dependency of O.J., 88 Wash.App. at 696, 947 P.2d 252.
¶ 49 Although the evidence here was certainly sufficient to terminate the mother's parental rights, the order of termination also terminated the children's rights to a parental relationship with their mother. Unfortunately, the order was entered without any independent advocacy for the "powerless and voiceless" children. In re Parentage of L.B., 155 Wash.2d at 712 n. 29, 122 P.3d 161. I would reverse and remand for the trial court to appoint a different GAL to thoroughly and independently investigate the children's circumstances and report to the court what decision would best serve their interests.
NOTES
[1] The trial court also terminated parental rights for the children's father, R.B. He is not a party to this appeal.
[2] RCW 13.34.030(5) provides:

"Dependent child" means any child who:...
(b) Is abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child; or
(c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.
[3] The children were dependent and in out-of-home care in the custody of DSHS from April 2004 to August 2005. During that dependency, K.B. participated in mental health treatment, drug and alcohol treatment, counseling for domestic violence issues, and parenting classes. The current dependency began a few months after the dismissal of the earlier dependency.
[4] K.B. does not challenge the trial court's findings for the first three statutory elements required for termination. Therefore, they are verities. RAP 10.3(g); In re Estate of Jones, 152 Wash.2d 1, 8, 93 P.3d 147 (2004).
[5] T.B.'s clerk's papers also state, "All the Court's verbal findings of fact stated on the record are fully incorporated herein." CP (T.B.) at 9.
[6] Caseworkers sent written copies of the individual service and safety plans to K.B. on eight occasions between March 2006 and October 2007, and the caseworkers referred K.B. to specific service providers or agencies for court-ordered remedial services on a number of occasions. These included mental health assessments, drug and alcohol assessments, urinalysis testing, parenting classes, and domestic violence victim support groups. K.B. completed many of these services during a previous dependency.
[7] The legislature amended RCW 13.34.105 in 2008, adding a new section that requires the GAL to "meet with, interview, or observe the child, depending on the child's age and developmental status, and report to the court any views or positions expressed by the child on issues pending before the court." Laws of 2008, ch. 267, § 13. This new statutory requirement is not at issue here, but we note that the report here would not satisfy the new statute.